IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HYACINTH WALKER, et al.,   :
    Plaintiffs    :
          :
    v.      :   CIVIL NO. AMD 04-3169
          :
TODD VILLAGE, LLC,    :
    Defendant    :
        ...o0o...

MEMORANDUM OPINION

Three "testers" and a fair housing organization filed the one-count complaint in this case seeking damages and injunctive relief pursuant to the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq*. (FHA), against the owner of a residential trailer park located in Carroll County, Maryland. Discovery having concluded, defendant has filed a motion for summary judgment as to the merits of plaintiffs' claim, including a discrete challenge to plaintiffs' request for punitive damages. No hearing is needed. *See* Local Rule 105.6. (D. Md. 2004). The motion will be denied for the reasons stated within.

I

Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248.  Summary judgment is

also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49.  "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).  Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matushita Elec. Indust. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

## II

Viewed in the light most favorable to plaintiffs, a reasonable jury could reasonably interpret the evidence in the summary judgment record in the following manner.

The trailer park had been owned since June 2002 by Todd Village, LLC (Todd

Village), a Maryland limited liability company controlled by Frederick Smith. Since Todd Village purchased the property (and for some time before then under the prior owner), the property has been managed by Jackie Riley from an office trailer at the trailer park.

Todd Village does not own, sell, rent, offer for sale, or offer to rent *residential trailers*. Rather, it acts solely as a *lessor of pads* (including utility hook-ups) on which the trailers owned by lessees of pads rest. It is not an official part of Riley's duties as Todd Village's on-site manager to broker sales or rentals of trailers, or otherwise to become involved in transactions between trailer-owners and real estate brokers and/or prospective buyers or renters of trailers. Nevertheless, in fact, Riley, in her capacity as manger of the trailer park, is knowledgeable concerning trailers generally, including pricing, construction, and financing, and in particular, concerning trailers presently offered for sale by residents of the trailer park, or imminently available for purchase or rental from residents of the trailer park.

At no time during the period relevant to this case has the trailer park had an African American resident on any of the 99 trailer pads held out for rental by Todd Village. In the spring of 2004, a resident of the trailer park, Elizabeth Banzet, overheard a conversation between Riley and others one afternoon during which she heard Riley make the following remark: "[T]here are no niggers in this park or Hispanics and there won't be as long as I am manager of this park."

Plaintiff Baltimore Neighborhoods, Inc., is a nonprofit organization that promotes fair

housing practices and has been a frequent litigant in federal and state court in fair housing cases. Plaintiffs Hyacinth Walker, Karl Starks, and Rhonda Henderson are African Americans engaged by BNI to conduct tests of Todd Village's housing policies in 2004.

Three series of tests were completed by plaintiffs. First, on May 7, 2004, testers made three visits to the trailer park and each had a discussion with Riley. During the first visit, at about 8:30 a.m., a white tester met with Riley and inquired about "buying" a trailer. During that visit, Riley quickly explained that she was not involved in the actual sale of trailers but, nevertheless, she was extremely forthcoming in her discussion with the white tester, providing detailed information concerning certain trailers that she believed were either on the market by their owners or soon would be. In particular, Riley mentioned that as to one pad, "Lot 3," the prior lessee had abandoned a decrepit old trailer and that the pad was available for lease but the abandoned trailer itself needed to be removed. Overall, Riley was courteous and helpful to the white tester.

At approximately 9:00 a.m. on the same day, May 7, 2004, an African American tester visited with Riley at the trailer park. The tester inquired about either "buying" or "renting" a trailer. Riley questioned the African American tester closely as to her credit history, present residence and as to how the tester had happened to come to the trailer park. Riley offered no information concerning the actual or potential availability of pads or of potential trailers for sale or rent by their owners; instead, she told the African American tester to "drive around" the park and "look for [sale] signs." In particular, Riley did not

mention the circumstances surrounding the decrepit trailer on, or the actual or potential availability of, Lot 3.

At approximately 1:45 p.m. that same day, May 7, 2004, a different white tester visited with Riley at the trailer park. Riley asked this tester if the tester wished to "rent or buy." She specifically advised the tester that three trailers at the park were being offered for sale by their owners. Riley pointed to the locations she described on a map, and she also mentioned the amount of money she thought the owners were asking. The tester left the office and examined several of the trailers in the park (pausing to chat with one of the owners) and then returned to the office. Upon her return, Riley provided significant additional information concerning the history of the trailers being offered for sale, including her opinion of their condition. Overall, she was extremely helpful and forthcoming with information, and she provided the tester with a copy of the trailer park's lease application.

BNI effected the second series of tests on June 14-15, 2004. An African American tester met with Riley at the trailer park at approximately 11:30 a.m. on June 14. Riley told the tester that turnover was limited and that nothing was available. She stated, when asked if anything might become available, that she had no way of knowing. Although she did explain the lease fees for a pad at the park, she suggested that the tester check with other trailer parks in the Baltimore metropolitan region, giving him directions to those parks.

On the next day, at approximately 11:02 a.m., a white tester met with Riley's son, who works at the trailer park as a handyman. The white tester received no substantial

information from the handyman, who apparently was simply standing in for Riley while she was away.

Finally, BNI effected a test during August 17-19, 2004. On August 17, an African American tester met with Riley at the trailer park at approximately 10:00 a.m. Riley told her that "absolutely nothing" was available and suggested that she visit a neighboring trailer park. Two days later, on August 19, 2004, a white tester telephoned the trailer park and spoke to Riley. There is no suggestion in the record that Riley knew the racial identity of the caller on August 19, 2004. Nevertheless, it is undisputed that, during that telephone conversation, Riley advised the caller of the likelihood that one of the park's residents would be moving from the trailer park in September. Moreover, Riley advised the caller of the potential availability of Lot 3.

## III

Defendant's motion for summary judgment is fairly narrow. Defendant does not challenge the standing of any plaintiff,[1] nor does the defendant challenge the availability of relief to plaintiffs on the record facts if they otherwise support a claim for discrimination under the FHA.[2] Nor does defendant dispute that at all relevant times, Riley had actual authority to manage the trailer park on its behalf, that she acted at all times in the scope of her employment, and that defendant is strictly liable for acts she took in her capacity as the

---

[1]*See Havens Realty Corp. Coleman,* 455 U.S. 363, 379 (1982).

[2]*See* 42 U.S.C. §3613(a)(1)(A),(c)(1).

trailer park manager.[3] Rather, the defendant argues that the evidence in the summary judgment record, even viewed in the light most favorable to the plaintiffs, is insufficient as a matter of law to sustain a claim under the FHA and, independently, that the facts are insufficient to sustain a claim for punitive damages under the FHA. I am persuaded that defendant is wrong on both issues.

A

Taking an extraordinarily crabbed view of the summary judgment record, defendant seeks to convert the undisputed fact that it does not "rent, sell, buy or broker trailer homes," *Reply Mem. at 1*, into a legal conclusion that because the plaintiff testers asked about buying or renting "trailers," the plaintiffs' claim fails as a matter of law. Moreover, while conceding, as it must, the existence of a genuine dispute over the credibility of plaintiffs' "wild accusation" that in the spring of 2004 Riley made the overtly racist statement attributed to her by Banzet ("[T]here are no niggers in this park or Hispanics and there won't be as long as I am manager of this park."), stating that "issues of credibility are for the jury," *id. at 7*, defendant makes the remarkable argument that the statement is "wholly immaterial to the pending motion." Finally, defendant argues that "any *de minimus* distinction between what some white testers and other African American and white testers were told about units

---

[3]*See Walker v. Crigler*, 976 F.2d 900, 904 & n. 5 (4th Cir.1992)("the duty of a property owner not to discriminate in the leasing or sale of that property is non-delegable"); *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir.1974) ("The discriminatory conduct of an apartment manager or rental agent is, as a general rule, attributable to the owner and property manager of the apartment complex, both under the doctrine of respondeat superior and because the duty to obey the law is non-delegable."); *cf. Meyer v. Holley*, 537 U.S. 280 (2003).

apparently for sale by third parties does not constitute actionable discrimination **based upon race**." *Id.* at *10* (emphases in original). These arguments betray defendant's grievous misapprehension of plaintiffs' burden in this case.

B

In relevant part, the FHA affords a private right of action to a plaintiff who shows that a defendant

> refuse[d] to negotiate for the . . . rental of, or otherwise ma[de] unavailable . . . a dwelling to any person because of race [or] color . . .
>
> discriminate[d] against any person in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race [or] color . . .
>
> represent[ed] to any person because of race [or] color that any dwelling is not available for inspection . . . rental when such dwelling is in fact so available.

42 U.S.C. §3604(a),(b), and (d). The FHA definition of "dwelling"[4] encompasses a pad suitable for installation of a residential trailer in a mobile home park. *See generally Taylor v. Rancho Santa Barbara*, 206 F.3d 932 (9thCir.2000); *United States v. Warwick Mobile Homes Estates, Inc.*, 558 F.2d 194 (4thCir.1977); *Stewart v. Furton*, 774 F.2d 706 (6thCir.1985); *United States v. Grooms*, 348 F.Supp. 1130 (M.D.Fla. 1972).

Although the well-known "shifting burdens" scheme for proof of employment and other discrimination claims is often applied in the context of housing discrimination claims,

---

[4]"'Dwelling' means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. §3602(b).

*see, e.g., Asbury v. Brougham,* 866 F.2d 1276, 1279-80 (10th Cir.1989), in the present case, plaintiffs have presented *direct evidence* of defendant's discriminatory motive and plaintiffs need not resort to that proof scheme. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 250 (9th Cir.1997). In this connection, defendant may regard Banzet's testimony regarding Riley's declared racial animus as merely a "wild accusation," but a reasonable juror would be entitled to find and conclude that Riley (1) made the statement and (2) acted on the racist motivation laid bare by the statement in her management of the trailer park. *Thus, this is a case of direct proof of intentional, purposeful discrimination.*[5]

Furthermore, a reasonable juror could reasonably conclude that Riley's disparate treatment of the white testers and the African American testers, as shown in the summary judgment record, was motivated by race. A jury could find that with white testers, Riley was extraordinarily helpful and encouraging, that she provided substantial information about potential options, *and that she specifically advised white testers of the circumstances surrounding Lot 3.* On the other hand, a jury could find that with African American testers, Riley was abrupt, inattentive, and actually discouraging of any prospect that a person of color could ever find any pads or trailers available in the trailer park, *and that she specifically declined to advise African American testers of the circumstances surrounding Lot 3.* In short, a jury could find that Riley was possessed of an overtly racist motivation in

---

[5]Obviously, Banzet's description of Riley's statement is not evidence of a "stray remark" lacking a nexus with Riley's duties as the trailer park manager, *cf. Harris v. Itzhaki,* 183 F.3d 1043, 1055 (9th Cir.1999), and defendant has not asserted the contrary.

carrying out her responsibilities as manager of the trailer park, and that such motivation is plainly reflected in the anecdotes reflected in this record. Such a finding would not be *compelled* on this record (e.g., perhaps Riley was just forgetful and, given the small sample of testers, her forgetfulness merely coincided with her encounters with African Americans), but such a finding would be well within the available plausible explanations for Riley's disparate treatment in her interactions with the respective testers.

Finally, as a matter of law, the mere fact that Todd Village was not officially involved in the purchase or sale or rental of *trailers* does not undercut plaintiffs' claim. The suggestion that it does is wholly untenable on this record. Plaintiffs have made a substantial showing that Lot 3, the pad with the abandoned trailer, was, *de facto*, available throughout the relevant period during the late spring and summer of 2004. Plaintiffs' evidence is clear and undisputed that Riley never mentioned Lot 3 to an African American tester but that she mentioned Lot 3 to others. Despite defendant's argument that the presence of the abandoned trailer on Lot 3 rendered Lot 3 "unavailable" as a matter of law, a reasonable juror could conclude to the contrary, and that Riley pointedly avoided mentioning Lot 3 to the African American testers out of a racial motivation.[6]

Thus, plaintiffs' evidence (including the inferences that reasonably could be drawn

---

[6]Defendant's reliance on the facts that Riley's son demonstrated no racial preference during his brief encounter with a white tester, and that the record does not disclose whether Riley knew the racial identity of the white tester with whom she had telephone contact in August 2004, does not undercut plaintiffs' showing. Manifestly, the weight and probative value of such evidence is for the trier of fact.

from such evidence), if believed by the jury, would reasonably support a jury finding that defendant (through Riley) "refuse[d] to negotiate for the . . . rental of, or otherwise ma[de] unavailable . . . a [trailer pad] to [the African American testers] because of race [or] color," "discriminate[d] against [the African American testers] in the terms, conditions, or privileges [in connection with the] rental of a [trailer pad], or in the provision of services or facilities in connection therewith, because of race [or] color," and "represent[ed] to [the African American testers], because of race [or] color, that [no trailer pad was] available for inspection [or] rental when such [a trailer pad was] in fact so available." In sum, plaintiffs have projected substantial, direct evidence in support of their claim of discrimination which, if believed, would comfortably support a reasonable finding by the jury in favor of plaintiffs.

## C

Punitive damages are available under the FHA. *See, e.g., Alexander v. Riga*, 208 F.3d 419 (3rdCir.2000), *cert. denied*, 531 U.S. 1069 (2001). The Third Circuit has explained, applying *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), and *Smith v. Wade*, 461 U.S. 30, 56 (1983), that under the FHA, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 208 F.3d at 431 (quoting *Smith*). But importantly, "'[m]alice' and 'reckless indifference,' in this context . . . . refer not to the egregiousness of the landlord's conduct, but rather to the landlord's knowledge that it may be acting in violation of federal law." *Id*. (citing *Kolstad*). The Court

held on the facts of that case:

> [T]hat because the jury's finding of a violation under the Fair Housing
> Act necessarily encompasses a finding of intentional discrimination, the plaintiffs
> need not also demonstrate that the conduct was particularly egregious or
> malicious in order to obtain punitive damages.
>
> Indeed, recklessness and malice may be inferred when a manager
> responsible for showing and renting apartments repeatedly refuses to deal with
> African-Americans about the apartment, and misrepresents the apartment's
> availability.

*Id. Cf. Lowery v. Circuit City Stores,* 206 F.3d 431, 442 (4th Cir.2000)(employment

discrimination claims).

In the instant case, Todd Village asserts that a punitive damages award is foreclosed

for want of proof that it "knew of or ratified" Riley's discriminatory acts. *See Pumphrey v.

Stephen Homes, Inc.*, 1997 WL 135688, at *2 (4th Cir. March 25, 1997) (unpublished). The

Fourth Circuit's imposition of a higher burden of proof than mere *respondeat superior* under

common law agency principles to the award of punitive damages in a housing discrimination

case in *Pumphrey* has been criticized as unwarranted, *see* Timothy J. Moran, *Punitive

Damages in Fair Housing Litigation: Ending Unwise Restrictions On a Necessary Remedy*,

36 HARV. C.R.-C.L. L. REV. 279, 321-22 (Summer 2001). In any event, I am persuaded that,

even assuming that the unreported opinion in *Pumphrey* might otherwise justifiably be

adhered to here, the Supreme Court's intervening decisions in *Kolstad* and *Meyer v. Holley*,

537 U.S. 280 (2003)(emphasizing, in an FHA case, that traditional agency theory applies to

damages awards in federal civil rights litigation), sufficiently undermine my confidence in

any reliance on that unpublished opinion that I decline to apply here.[7] Moreover, viewing

the summary judgment record in the light most favorable to plaintiffs, and in particular,

recalling that there had never been an African American tenant in the trailer park during the

two years between Todd Village's purchase of the trailer park in 2002 and the events giving

rise to this lawsuit in 2004, I am satisfied that the question of the extent to which Todd

Village knew of and/or acquiesced in Riley's practices is for the trier of fact. *See United

States v. Quality Built Const., Inc.*, 309 F.Supp.2d 756, 766 (E.D.N.C. 2003)(denying motion

for summary judgment on the issue of punitive damages in an FHA case).

IV

For the reasons set forth above, the motion for summary judgment shall be denied.

An order follows.


Filed: March 13, 2006                          _____/s/_____
                                               Andre M. Davis
                                               United States District Judge


_____

[7]Todd Village has available to it a "good faith" defense to punitive damages. *See Riga*, 208 F.3d at 433-34 (citing *Kolstad*). Indeed, Riley testified on deposition that she knew that she was not permitted to discriminate on the basis of race or color. Accordingly, a jury could reasonably conclude, perhaps, that Todd Village had no reason to think any training or instruction or other anti-discrimination policies or practices were needed in order for it to satisfy its obligations under federal law.